# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

LAFAYETTE CITY-PARISH CONSOL.          Civil Action No. 22-1127

versus                                 Judge Robert R. Summerhays

GOVERNMENT OF ST. MARTIN               Magistrate Judge Carol B Whitehurst
   PARISH, ET AL.

## REPORT AND RECOMMENDATION

Before the undersigned, on referral from the district judge, is the Rule 12(b)(6) Motion to Dismiss Fourth Amended Complaint [Doc. 70] filed by defendant St. Martin Parish Government ("SMPG").  The motion is opposed by plaintiff Lafayette City-Parish Consolidated Government ("LCG") [Doc. 78]. SMPG filed a Reply. [Doc. 79]. For the following reasons, IT IS RECOMMENDED that the Motion to Dismiss be GRANTED, and the claims of LCG be DENIED AND DISMISSED WITH PREJUDICE.

## FACTUAL AND PROCEDURAL BACKGROUND

This matter comes before the undersigned in a rather convoluted procedural posture.  The record is littered with amended complaints, motions to amend, and motions to dismiss, some of which seek to dismiss claims in amended complaints that are no longer viable.  Much of the confusion stems from the fact that, in response to certain motions to dismiss, rather than objecting to the motion and

awaiting adjudication by the Court, the plaintiff simply filed an amended complaint.  Considering the foregoing, while setting forth the legal issues for analysis and determination, the Court will also attempt to clean up the record.

The lawsuit arises from a flood mitigation project by LCG involving, among other things, reducing a spoil bank on the St. Martin Parish side of Vermilion Bayou.  LCG argues this would improve the flow of stormwater into and out of the Cypress Island Swamp and reduce flooding in Lafayette Parish.  *See* Fourth Amended Complaint, Doc. 59 at ¶¶ 3–33.  LCG alleged that it began coordinating with SMPG on this project in 2020 but that SMPG opposed permitting by the U.S. Army Corps of Engineers ("Corps") and passed Ordinance 14-71, which amended/revised Chapter 14 of the St. Martin Parish Code of Ordinances, by enacting Ordinance 14-71 and revising Ordinance 14-2 to change the definition of "levee."  Ordinance 14-71 now requires a permit by the parish council for "[a]ny development which includes the construction, alteration, or removal of any sort of levee or levee system."  St. Martin Par. Ord. 14-71 (No. 21-07-1327-OR, 7-6-2021).

Maintaining that Corps permitting was not required and that Ordinance 14-71 was unconstitutional, LCG executed the spoil bank project in February 2022 by essentially removing the spoil bank in St. Martin Parish without notifying St. Martin Parish.  Doc. 59, ¶32.  The SMPG president allegedly responded with

2

threats of litigation.  *Id.* at ¶¶35-36.  LCG then filed suit in the Fifteenth Judicial District Court, Lafayette Parish, Louisiana against SMPG and the Corps, seeking a declaratory judgment that it had complied with all lawful regulations, rules, ordinances, and laws in the spoil bank project and that a Corps permit was not required.  *Id.* at ¶37.  The United States, appearing on behalf of the Corps, removed the action to this court based on federal question jurisdiction.  [Rec. Doc. 1].  St. Martin Parish filed a Motion to Dismiss or, in the alternative, Motion for More Definite Statement [Rec. Doc. 5] and, in response, LCG amended its complaint [Rec. Doc. 8].  The first Motion to Dismiss was then denied as moot, LCG having amended its complaint.  [Rec. Doc. 25].

In the amended complaint, LCG refined its allegations and sought a declaratory judgment that (1) it "has no liability to St. Martin Parish for any work associated with the spoil bank project," (2) Ordinance 14-71 is unconstitutional; (3) alternatively, LCG did not violate Ordinance 14-71; and (4) no Corps permit was required for the spoil bank project as executed in February 2022.  [Rec. Doc. 8, ¶¶35–39].  SMPG again moved for dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) or, in the alternative, a more definite statement under Rule 12(e) [Rec. Doc. 16].  Over opposition from LCG, the Court granted the motion to dismiss for lack of jurisdiction.  [Rec. Docs. 28, 29].  In so doing, the Court found that the claims against SMPG were not ripe because a declaration of

no liability would depend on premature adjudication of LCG's tort liability for any future effects of the project in St. Martin Parish. [Rec. Doc. 28].[1]

Shortly thereafter, LCG filed a Motion for Reconsideration [Rec. Doc. 30] of the Court's ruling, as well as a Motion to Amend the First Amended Complaint [Rec. Doc. 32]. The USA also filed a Motion to Dismiss for Lack of Jurisdiction [Rec. Doc. 33]. Before the Court ruled on the Motion to Amend the First Amended Complaint, LCG filed a Motion for Leave to File a Third Amended Complaint [Doc. 50].[2] On August 18, 2022, the Court granted LCG's Motion to Reconsider, denied the Motion for Leave to Amend the First Amended Complaint, and ordered that LCG file a "final" Motion for Leave to Amend to attempt to cure the deficiencies in its claims against SMPG. On September 1, 2022, LCG filed its Motion for Leave to File a Fourth Amended Complaint, which was granted by the undersigned [Rec. Doc. 58]. Several weeks later, the case was reassigned to Judge Summerhays.

What is pending now is SMPG's motion to dismiss LCG's Fourth Amended Complaint. In reconsidering the dismissal of LCG's claims, Judge Cain made

---

[1] Immediately following that ruling, SMPG filed a "Petition for Mandatory Injunction" against LCG in the 16th Judicial District Court, St. Martin Parish, Louisiana, where it requested an order for LCG to restore, replace, and reconstruct the previously existing spoil bank, based on the alleged violation of Ordinance 14-71 as well as its belief that the spoil bank removal will significantly increase the likelihood of flooding in St. Martin Parish.

[2] This motion is no longer pending, given that a Fourth Amended Complaint was thereafter filed with the permission of the district judge.

several findings and narrowly permitted one final attempt by LCG to state a claim, as follows:

1.   The district judge dismissed LCG's claim that it did not violate Ordinance 14-71, finding that any claim to that effect is futile.

2.   The district judge determined that the doctrine of unclean hands does not apply in this case to limit LCG's ability to challenge the constitutionality of Ordinance 14-71.

3.   The district judge held that LCG, thus far, has not pled a viable Commerce Clause violation, however, the judge allowed LCG "one final attempt" to sufficiently plead a Commerce Clause violation, finding that LCG's "sole ability to obtain standing [ ] hinges on the extent to which Ordinance 14-71 is protectionist at the local level."[3]

Considering the foregoing, the relief afforded LCG in the district judge's ruling is narrowly construed by this Court.[4]   The Ruling does not permit new claims to be pled, but rather, allows LCG one final opportunity to adequately plead a claim for violation of the Commerce Clause.   Based upon this Court's interpretation of the jurisprudence, the undersigned finds that LCG has not sufficiently pled a Commerce Clause violation.

---

[3] *See* Memorandum Order, Rec. Doc. 53, at p. 13.

[4] Judge Cain also rejected LCG's arguments that Ordinance 14-71 is unconstitutional on grounds it targeted LCG's plans with respect to the spoil banks and that the ordinance is unconstitutionally vague/overbroad.  Consequently, the Court does not revisit these arguments.

## LAW AND ANALYSIS

### A. Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, the plaintiffs must plead enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S.Ct. at 1949. A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232–33 (5th Cir.2009); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir.1996). But the Court is not bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 129 S.Ct. at 1949–50.

A legally sufficient complaint must establish more than a "sheer possibility" that plaintiffs' claim is true.  *Id*.  It need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action.  *Twombly*, 550 U.S. at 555.  In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiffs' claim.  *Lormand*, 565 F.3d at 255–57.  If there are insufficient factual allegations

to raise a right to relief above the speculative level, *Twombly*, 550 U.S. at 555, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, *Jones v. Bock*, 549 U.S. 199, 215 (2007); *Carbe v. Lappin*, 492 F.3d 325, 328 & n. 9 (5th Cir.2007), the claim must be dismissed.

### B.   Dormant Commerce Clause Analysis

The narrow question before the Court is whether LCG can state a Commerce Clause claim against SMPG by establishing that Ordinance 14-71[5] is "protectionist at the local level." Thus, this Court must determine whether LCG's claims fall within the "zone of interests" protected by the Commerce Clause. *See Wyoming v. Oklahoma,* 502 U.S. 437, 469, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992) (noting that the zone-of-interests test "governs claims ... under the negative Commerce Clause"); *see also Pine Belt,* 389 F.3d at 499 ("The key inquiry for prudential standing in this case is whether the injury of which plaintiffs complain is 'arguably within the zone of interests to be protected' by the dormant Commerce Clause, the 'constitutional guarantee in question' here.") (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). "The burden of establishing that a challenged statute has a discriminatory purpose under the Commerce Clause falls on the party

---

[5] Inasmuch as LCG did not plead claims under Ordinance 14-2 in its first 3 complaints and given that the district judge's Ruling made clear the narrow scope of his reconsideration of the claims pled in the plaintiff's first three complaints, claims under Ordinance 14-2 have not been permitted and will not be considered herein.

challenging the provision." *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 945 F.3d 206, 214 (5th Cir. 2019), citing *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007).

    Although the Commerce Clause is an affirmative grant of power to Congress, U.S. CONST. art I, § 8, cl. 3, the Supreme Court has interpreted the clause to contain a negative aspect, the so-called "dormant" Commerce Clause. *Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 497 (5th Cir. 2004), *citing Dickerson v. Bailey,* 336 F.3d 388, 395 (5th Cir.2003). The dormant Commerce Clause "'prohibits economic protectionism -- that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Id.* (quoting *Wyoming v. Oklahoma,* 502 U.S. 437, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992)). *See also Dep't of Revenue v. Davis,* 553 U.S. 328, 337–38, 128 S.Ct. 1801, 170 L.Ed.2d 685 (2008) ("The dormant Commerce Clause 'is driven by concern about economic protectionism -- that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'") (citation and internal quotation marks omitted). Considering the foregoing, an evaluation of Ordinance 14-71's allegedly protectionist features is critical to the Court's consideration of LCG's dormant Commerce Clause argument. As such, this Court will look to see if a claim under the dormant Commerce Clause falls within the zone of interests by asking: (1)

8

whether plaintiff "ha[s] standing to challenge the [ordinance] as facially discriminatory against out-of-state economic interests," or (2) whether plaintiff "can merely challenge the ordinance[] as being excessively burdensome to interstate commerce." *Pine Belt,* 389 F.3d at 499.  In other words, this test requires us to "ask whether the ordinance[ ] 'reflect[s] a discriminatory purpose or merely a discriminatory effect.' " *Id.* at 497 (quoting *Dickerson v. Bailey,* 336 F.3d 388, 396 (5th Cir.2003)).  The test is disjunctive, allowing LCG to show either that the ordinance discriminates against out-of-state interests on its face or that the ordinance as applied unduly burdens their out-of-state interests.  *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473–75 (5th Cir. 2013)

Before this Court can consider the merits, it must first determine whether LCG has standing to challenge the flow control ordinances.  Although SMPG has not explicitly raised the issue of standing in their latest motion, this Court may consider it *sua sponte.  Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 497 (5th Cir. 2004), *citing Bauer v. Texas,* 341 F.3d 352, 357 (5th Cir.2003).  The standing analysis consists of constitutional and prudential components.

### 1. Constitutional Standing

"To meet the constitutional standing requirement, a plaintiff must show (1) an injury in fact (2) that is fairly traceable to the actions of the defendant and (3)

that likely will be redressed by a favorable decision." *Nat'l Solid Waste Mgmt.*, 389 F.3d at  498, *citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

> Ordinance 14-71 provides, in relevant part:
>
> Any development which includes the construction, alteration, or removal of any sort of levee or levee system as defined in this chapter, including, but not limited to, section 14-2, shall require a permit issued and approved by the floodplain administrator and specifically approved by majority vote of the St. Martin Parish Council. Upon request of the floodplain administrator or parish president, the request for such a permit shall be accompanied by an engineering study which details the impact of the said development inclusive of hydrological and hydraulic analysis. In those instances where the development includes the removal of a levee or levee system, the original purpose for the construction of the said levee or levee system shall be irrelevant.

St. Martin Par. Ord. 14-71 (No. 21-07-1327-OR, 7-6-2021).[6]

In the instant case, the undersigned concludes that LCG meets the constitutional, or Article III, standing requirements.  Because of Ordinance 14-71, any development which includes the construction, alteration, or removal of any sort of levee system requires a permit and approval by the floodplain administrator,

---

[6] The Chapter defines "development" as "any manmade change to improved and unimproved real estate, including, but not limited to, buildings or other structures, mining, dredging, filling, grading, paving, excavation or drilling operations or storage of equipment or materials."  Id. at Ord. 14-2 (Ord. No. 19-12-1282-OR, 12-3-2019; Ord. No. 21-07-1327-OR, 7-6-2021). Meanwhile, a "levee" is "a manmade structure of any nature, earthen or otherwise, along any water body that contains, controls, diverts, detains, retains, or which aids in the containment, control, or diversion of the flow of water on or across any real estate" and a "levee system" is a flood protection system consisting of "a levee, or levees, and associated structures . . ." *Id.* Finally, a "structure" is defined, for floodplain management purposes, as "a walled and roofed building . . . that is principally above ground[.]" *Id.*

and in some instances, an engineering study with accompanying hydrological and hydraulic analysis. Thus, LCG demonstrates an injury (the permit application process, along with the costs of engineering studies) that is traceable to the ordinance enacted by SMPG and which would be remedied if this Court finds that the ordinance is unconstitutional. Thus, constitutional standing is established.

### 2. Prudential Standing

The goal of the prudential standing requirements is to "determine whether the plaintiff 'is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.'" *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 106 S.Ct. 1326, 1334 n. 8, 89 L.Ed.2d 501 (1986). "These judicially created limits concern whether a plaintiff's grievance arguably falls within the zone of interests protected by the statutory provision invoked in the suit, whether the complaint raises abstract questions or a generalized grievance more properly addressed by the legislative branch, and whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties." *Id.*

The key inquiry for prudential standing in this case is whether the injury of which plaintiff complains is "arguably within the zone of interests to be protected" by the dormant Commerce Clause, the "constitutional guarantee in question" here. *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827,

11

830, 25 L.Ed.2d 184 (1970). *See also Boston Stock Exch. v. State Tax Comm'n,* 429 U.S. 318, 97 S.Ct. 599, 603 n. 3, 50 L.Ed.2d 514 (1977) (applying the zone of interests test in the context of the dormant Commerce Clause). The facts of this case require the undersigned to analyze the zone of interest question in two parts: There must be a determination of whether LCG has standing to challenge Ordinance 14-71 as being facially discriminatory against out-of-state economic interests or whether it can merely challenge the ordinance as being excessively burdensome to interstate commerce. *See Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 945 F.3d 206, 213 (5th Cir. 2019) ("A statute violates the dormant Commerce Clause where it discriminates against interstate commerce either facially, by purpose, or by effect."), *citing Allstate*, 495 F.3d at 160.

### a.      Facially Discriminatory

Ordinance 14-71 mandates that any development which includes the construction, alteration, or removal of any sort of levee or levee system requires a permit issued and approved by the floodplain administrator and specifically approved by majority vote of the St. Martin Parish Council.  Thus, the ordinance prohibits the development of any levee system within St. Martin Parish without the required permit, and there is no distinction between in-parish or out-of-parish developers, or in-state or out-of-state developers.  The ordinance applies to "any

levee system" located within St. Martin Parish and to the extent LCG suffers an injury, such injury is not related to any out-of-parish or out-of-state characteristics of LCG's operations. Although the Complaint contains conclusory allegations regarding the ordinance's effect on interstate commerce, the Complaint contains no allegations that the ordinance discriminatorily affects LCG's or any other entity's out-of-state economic interests. Thus, Ordinance 14-71 is facially neutral, and LCG does not have standing to challenge Ordinance 14-71 on the basis of a claim that it is facially discriminatory against out-of-state interests.

### b.    Burden on Interstate Commerce

The Court next considers whether LCG has standing to challenge Ordinance 14-71 on the basis that it excessively burdens interstate commerce as discriminatory in effect.  The undersigned concludes that LCG does not meet the zone of interests test in this regard and thus does not have standing to challenge ordinance 14-71 as to its alleged burden on interstate commerce, because the protected-against injury is not an excessive burden on *interstate commerce*.

It is undisputed that water is an article of commerce.  *Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941, 102 S. Ct. 3456, 73 L.Ed.2d 1254 (1982). Furthermore, the Supreme Court has noted that, generally, a state -- or one of its political subdivisions -- may not avoid the strictures of the Commerce Clause by curtailing the movement of articles of commerce through subdivisions of the state,

13

rather than through the State itself.  *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Nat. Res.*, 504 U.S. 353, 361, 112 S. Ct. 2019, 2024, 119 L. Ed. 2d 139 (1992) (holding that a Michigan statute prohibiting private landfill operators from accepting solid waste originating outside county in which their facilities are located, unless authorized by county's solid waste management plan, violated the Commerce Clause).  Importantly, in *Fort Gratiot Sanitary Landfill*, the Court held that the State did not satisfy its burden of proving that the waste import restrictions in question furthered health and safety concerns and therefore could not avoid a Commerce Clause violation.  504 U.S. at 367.

In the instant case, LCG reduced the height of a spoil bank in St. Martin Parish, thereby affecting the flow of water from Lafayette Parish to St. Martin Parish.  The precise question before the Court is whether Ordinance 14-71 -- which requires a permit in order to construct, alter, or remove any sort of levee or levee system, which affects the flow of water -- is protectionist at the local level.

In *Sporhase*, the Supreme Court discussed the unique nature of water as both a natural resource and an article of commerce, explaining that a state has more power to regulate the flow of water because of its responsibility to protect the health and welfare of its citizens, as follows:

> Moreover, in the absence of a contrary view expressed by Congress, we are reluctant to condemn as unreasonable, measures taken by a State to conserve and preserve for its own citizens this vital resource in times of severe shortage. Our reluctance stems from the

14

"confluence of [several] realities." *Hicklin v. Orbeck*, 437 U.S. 518, 534, 98 S.Ct. 2482, 2491, 57 L.Ed.2d 397 (1978). **First, a State's power to regulate the use of water in times and places of shortage for the purpose of protecting the health of its citizens -- and not simply the health of its economy -- is at the core of its police power. For Commerce Clause purposes, we have long recognized a difference between economic protectionism, on the one hand, and health and safety regulation, on the other.** See *H. P. Hood & Sons v. Du Mond*, 336 U.S. 525, 533, 69 S.Ct. 657, 662, 93 L.Ed. 865 (1949). Second, the legal expectation that under certain circumstances each State may restrict water within its borders has been fostered over the years not only by our equitable apportionment decrees, see, *e.g., Wyoming v. Colorado*, 353 U.S. 953, 77 S.Ct. 865, 1 L.Ed.2d 906 (1957), but also by the negotiation and enforcement of interstate compacts. **Our law therefore has recognized the relevance of state boundaries in the allocation of scarce water resources**. **Third, although appellee's claim to public ownership of Nebraska ground water cannot justify a total denial of federal regulatory power, it may support a limited preference for its own citizens in the utilization of the resource**. See *Hicklin v. Orbeck, supra*, 437 U.S., at 533–534, 98 S.Ct., at 2491. In this regard, it is relevant that appellee's claim is logically more substantial than claims to public ownership of other natural resources. See *supra*, at 3462–3461. Finally, given appellee's conservation efforts, the continuing availability of ground water in Nebraska is not simply happenstance; the natural resource has some indicia of a good publicly produced and owned in which a State may favor its own citizens in times of shortage. See *Reeves, Inc. v. Stake*, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980); cf. *Philadelphia v. New Jersey*, 437 U.S., at 627–628, and n. 6, 98 S.Ct., at 2537, and n. 6; *Baldwin v. Montana Fish and Game Comm'n*, 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978). A facial examination of the first three conditions set forth in §46–613.01 does not, therefore, indicate that they impermissibly burden interstate commerce. Appellants, indeed, seem to concede their reasonableness.

*Sporhase*, 458 U.S. at 955–57 (emphasis added).  *See also California v. United States*, 438 U.S. 645, 653, 98 S. Ct. 2985, 2990, 57 L. Ed. 2d 1018 (1978) ("The history of the relationship between the Federal Government and the States in the

reclamation of the arid lands of the Western States is both long and involved, but through it runs the consistent thread of purposeful and continued deference to state water law by Congress.").

The Fifth Circuit case of *Wood Marine Serv., Inc. v. City of Harahan*, 858 F.2d 1061, 1063 (5th Cir. 1988) is instructive.  Wood Marine, an operator of maritime services, wished to commence loading and unloading of crushed limestone and other construction materials at its existing facilities within a batture located in the city of Harahan.  858 F.2d at 1062.  Harahan, Louisiana borders on the Mississippi River in Jefferson Parish, while a levee 140 feet wide and 20 feet high protects Harahan from the river's natural meanderings.  *Id.*  This batture,[7] located in Harahan, has been commercially developed to participate in the commerce that flows with the Mississippi River.  Wood Marine engages in maritime operations on the river and batture, including barge fleeting, the mooring of other vessels, cargo loading and discharge, and the dredging and storing of river sand.  *Id.*

In May 1986, Wood Marine informed the Jefferson Parish Levee District (the "Levee District") that Wood Marine would commence the loading and unloading of crushed limestone and other construction materials at its existing facilities within Harahan, and the Levee District responded that Wood Marine

---

[7] A "batture" is alluvial land between the river's low water edge and the inside of a levee.

16

could not begin such operations without a permit.   *Id.*   Wood Marine filed a complaint seeking injunction against the Board of Commissioners for the East Jefferson Levee District, alleging that the Levee District and the City of Harahan had conspired to prevent Wood Marines' operations in violation of the Commerce Clause.   *Id.*   The City of Harahan intervened and argued that the granting of the injunction would deprive the city of its right to regulate commerce through zoning in order to protect the health and property of its citizens, specifically citing the city's zoning ordinances governing development of the batture to defend against the injunction.  *Id.* at 1062-63.

The matter went to trial upon stipulated testimony and exhibits, which chronicled the history of the zoning ordinance, but did not establish its efficacy or isolate its goals. Wood Marine argued that the ordinance was preempted by state and federal statutes and violated the Commerce Clause.   The district court concluded that, although the city had authority under federal and state statutes to adopt the ordinance, it had not substantiated the benefits of the ordinance, and that without substantiating the efficacy of the ordinance, the city could not justify its burden upon interstate commerce under the Commerce Clause.  *Id.* at 1063.

On appeal, the Fifth Circuit reversed, specifically finding that the City's zoning ordinance did not burden interstate commerce, as follows:

> Although the city supplied little direct evidence that the ordinance would serve its apparent purpose, **we need not reach the balancing**

**test because we find no evidence of any burden upon interstate commerce**. Before the standards derived from the Commerce Clause are applied some burden must be established. *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 127–28, 98 S.Ct. 2207, 2214– 15, 57 L.Ed.2d 91 (1978); *Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 448, 80 S.Ct. 813, 818, 4 L.Ed.2d 852 (1960).

**In this case, there is no evidence of even an incidental burden on interstate commerce.**  The sole demonstrated effect of the zoning is that Wood Marine will not be able to discharge crushed limestone and other construction materials at its Harahan facility. There is no evidence that less of these materials will be shipped into Louisiana. Wood Marine complains only that it will not be the consignee or user. However, the "Commerce Clause protects the interstate market, not particular firms, from prohibitive or burdensome regulations." *Exxon,* 437 U.S. at 127–28, 98 S.Ct. at 2214–15. That alternative routes will have to be found for the interstate shipment of construction material into Louisiana does not establish the existence of a burden upon interstate commerce. "[I]nterstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another." *Id.* at 127, 98 S.Ct. at 2214.

[ . . . ]

**Louisiana law protects the flow of interstate commerce down the Mississippi. Local governments are permitted to zone only private uses of the batture that cannot affect the flow of interstate trade. If they comply with state law, local governments can affect only the local market structure. Their lawful actions will not implicate the national market or the Commerce Clause, because that Clause does not protect any particular structure or method of operation in a retail market**. *Id.* at 127, 98 S.Ct. at 2214, citing 🚩*Breard v. City of Alexandria,* 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951). The fact that Wood Marine has been excluded from the business of shipping construction materials does not, without more, implicate the Commerce Clause.

*Id.* at 1065–66 (emphasis added).

18

Similarly, in the instant case, LCG presents no facts evidencing even an incidental burden on interstate commerce. Ordinance 14-71 merely requires a permit before development, construction, or alteration of a levee system can be undertaken in St. Martin Parish. There is no allegation of an impact on goods or services coming into or leaving the state. Indeed, where the plaintiff alleges only an intrastate burden, a court cannot manufacture an interstate burden to implicate the Commerce Clause. *See, e.g., On the Green Apartments, LLC v. City of Tacoma*, 241 F.3d 1235, 1242 (9th Cir. 2011).

As noted in *Sporhase*, courts recognize a difference between economic protectionism, on the one hand, and health and safety regulation, on the other. Indeed, the *Sporhase* court recognized the relevance of state boundaries in the allocation of scarce water resources and a limited preference for its own citizens in the utilization of water. *Sporhase*, 458 U.S. at 955–57. Given that the practical effect of this ordinance is to ensure the health and safety of the citizens of St. Martin Parish during a flood or other weather event where water rises, the undersigned finds that any burden on intrastate commerce is sufficiently balanced by the welfare of the St. Martin Parish population.

Ergo, it is the finding of the undersigned that LCG lacks standing to assert a Commerce Clause claim, and the Rule 12(b)(6) Motion to Dismiss Fourth Amended Complaint [Doc. 70] should be granted.

19

Finally, to the extent that LCG asserts new claims in its Fourth Amended Complaint, those claims are beyond the scope of the district judge's August 18, 2022 Ruling and it is recommended that they be dismissed.  Specifically, the undersigned recommends dismissal of the following recently-added claims:

- SMPG lacks authority to legislate and/or had no authority to enact Ordinance 14-71 under its own Home Rule Charter;

- SMPG violated its Home Rule Charter by not allowing public comment;

- SMPG violated its Home Rule Charter by failing to follow the publication requirements;

- SMPG violated the Home Rule Charter by failing to give sufficient notice before enacting ordinances;

- SMPG violated the Home Rule Charter by failing to comply with the requirements for amendment of ordinances and titling of subject matter; and

- SMPG violated the Home Rule Charter by failing to adopt ordinances within the proper time frame.

As set forth above, the district judge allowed LCG "one final attempt" to sufficiently plead a Commerce Clause violation.  Nowhere in his Ruling did the judge permit the expansion of the pleadings to include new claims not previously pled.  Thus, for the foregoing reasons,

**IT IS RECOMMENDED** that the Rule 12(b)(6) Motion to Dismiss Fourth Amended Complaint [Doc. 70] be GRANTED, as more specifically set forth below.

**IT IS RECOMMENDED** that LCG's Commerce Clause claims be DENIED AND DISMISSED WITH PREJUDICE.

**IT IS FURTHER RECOMMENDED** that, to the extent that LCG has re-pled claims in its Fourth Amended Complaint that were denied by the district judge in his August 18, 2022 Ruling, these claims are DENIED AND DISMISSED WITH PREJUDICE.   These claims include LCG's claim for a declaratory judgment against SMPG on grounds Ordinance 14-71 is unconstitutional and, alternatively, LCG's claim that it did not violate Ordinance 14-71.

**IT IS FURTHER RECOMMENDED** that the following claims alleged by LCG be DENIED AND DISMISSED WITHOUT PREJUDICE and STRICKEN from the Fourth Amended Complaint, as they are beyond the scope of the district judge's limited grant of leave to amend the Complaint:

- claim alleging that SMPG lacks authority to legislate and/or had no authority to enact Ordinance 14-71 under its own Home Rule Charter;
- claim alleging that SMPG violated its Home Rule Charter by not allowing public comment;
- claim alleging that SMPG violated its Home Rule Charter by failing to follow the publication requirements following introduction;
- claim alleging that SMPG violated the Home Rule Charter by failing to give sufficient notice before enacting ordinances;

- claim alleging that SMPG violated the Home Rule Charter by failing to comply with the requirements for amendment of ordinances and titling of subject matter; and
- claim alleging that SMPG violated the Home Rule Charter by failing to adopt ordinances within the proper time frame.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after being served with a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Civ. P 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

**THUS DONE AND SIGNED** this 15th day of March, 2023 at Lafayette, Louisiana.

CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE